Good morning, may it please the Court, Your Honor. Norman Trabulis from Mr. Simpson. And with the Court's indulgence, I'd like to begin by addressing the contents of the supplemental appendix which was filed last week, not because I think the Court should ascribe any particular importance to them, but this is my only opportunity to address them. I just saw them last week. All of those probation reports of codefendants that were included there, none of them contain Yearwood's inconsistent statement. And neither does the probation report from Mr. Simpson. That simply reflects that all of those reports were prepared after Mr. Simpson's trial. And they reflect the account of the events that was in that trial. Mr. Holder's report was prepared prior to the trial, prior to Mr. Simpson's trial, and it reflects Yearwood's inconsistent statement. That's all that can be inferred from that. Moreover, the Court should know that although these reports were given to the Court, they contain a damaging statement ascribed to Mr. Simpson which the government has admitted in court, in the district court, was never made. They say, all of those reports, I can give you the paragraphs, it's usually paragraph 14, that Simpson said that although he used to smuggle narcotics into the United States, he felt that it became too dangerous to make the courier trips himself. And that's in there, and that was in Simpson's report, too, and he objected to it. And the government, by Mr. Ariel, wrote a letter to Judge Johnson, and it said, the government advises that it is aware of no evidence that the defendant told the government that although he used to smuggle narcotics into the United States, he felt that it became too dangerous to make the courier trips himself. So not only should that not color the Court's view of Mr. Simpson in this case, but it should also, to the extent the Court may want to look at other things in those reports, not let them color it either. And that false statement in those reports came from somewhere, and the probation officer didn't make it up herself, or several different probation officers. And it surely didn't come from Mr. Ariel, because when it was brought to his attention, he corrected it. I would submit to Your Honor, the inference is that it came from an agent, and there is reason to suspect that there may be a pattern of agent misconduct in this case with regard to Mr. Simpson, a pattern which may involve the Brady violation. And that Brady in the housekeeping matter, are you abandoning the ineffective assistance of counsel argument? Only if the government somehow maintains that the Yearwood inconsistent statement was disclosed. If it wasn't disclosed and there's no evidence that it was, sure, it doesn't apply, I'm abandoning it. But if the government somehow gets up and says, well, we managed to disclose it to the, it was disclosed, well, then, sure, it was ineffective not to use it. But I think when I filed my original papers down below, I didn't have the Yearwood 3500 material. I was hoping to receive it, to have it, and I didn't have it. And I didn't know what was disclosed to the trial counsel and what wasn't. Then I eventually got it. And it appeared not to be disclosed. The government in its papers says they didn't disclose the pre-sentence investigation to hold a report. That's what they say in their brief. So I don't think they're saying it was disclosed. And if it wasn't disclosed, there was no ineffectiveness. Even if counsel didn't try harder to get stuff, there was no obligation to do it. I mean, the government had an obligation to turn that over. So I really do see that as out of the picture. So the Brady violation was clear here. I mean, Yearwood had told two completely irreconcilable stories. In one of them, she ascribed to Mr. Simpson criminal conduct, which she had ascribed to Mr. Holder, in the other. One of those stories was that Holder and his brother Hayden had recruited her in Pennsylvania and he arranged two trips. And it also appears in the Holder complaint. And you kind of need the Holder pre-sentence investigation report as a Rosetta Stone to figure out that they're talking about Yearwood. But I don't think there's any dispute that they are. And there, she wrote, I mean, the government, the agents swore to a complaint that said that CW1, that's Yearwood, provided the information that a man named Sheldon Holder met with CW1 and set up two drug smuggling trips for CW1 from Trinidad to the United States. And then it describes the trips and it dovetails, it matches the trips that Yearwood made. So not only is the government not disclosing that Yearwood gave this inconsistent statement, they're using this inconsistent statement to prosecute another person for the same conduct which Yearwood testified Simpson did. And they're irreconcilable. I mean, obviously, both men could be guilty of the conspiracy. But the facts that are being testified to are irreconcilable. And I think if, I mean, I don't understand why the government filed that supplemental argument. I don't think there's any dispute that this statement was made by Yearwood. And I think they would really be judicially stopped from denying it, having utilized it, to prosecute Holder. So this was critical because the only witness at the trial who said and was in a position to know that Simpson was supposedly a knowing participant in the conspiracy was Yearwood. And the government went through the usual thing that they do with cooperators and she testified on direct that she had an agreement and that if she didn't tell the truth, that agreement was going to be, and these are her words, demolished. So she had they they this is a person who ordinarily would not be found to be a tremendously credible. Breyer. I'm sorry, but wasn't her testimony significantly corroborated by, among other things, pocket trash, phone records that completely corroborated what she her testimony during the trial? Her testimony was corroborated. And Simpson's wife, Regina, testified. And if her testimony is to be believed and is accepted, it negates the strongest corroboration, which are the phone records and the car being present, because she testified. The other guy's girlfriend who. Yes. Sophia McIntosh. And obviously the jury did not accept her testimony. And what you had was two different witnesses, Yearwood and Regina Simpson, testifying in effect inconsistently. And what you've got was one of the reasons why that testimony of Regina Simpson might well have been rejected was because of Yearwood. Yearwood was not impeached. I mean, she was impeached as a drug user, as somebody who hung out with the Bloods, who had held guns for the Bloods, who had done all kinds of, you know, petty-type stuff besides that, including drug use and some minor drug sales. But she was not impeached in any way as having lied. She was presented as somebody who, bad as she was and terrible as she was in terms of kind of person you might not want to associate with, nevertheless, she had a very strong motive not to lie and wasn't lying. And I think it would have made a difference to the jury, both in the case depended upon her testimony and that also the negation of Regina Simpson. Sure, Regina Simpson was an interested witness and loved her husband and all that. But negating the inference that flowed from her testimony also depended on accepting Yearwood's testimony. And she was presented as somebody who wasn't lying and had a tremendous motive not to lie. I think it would be very different, and it's more than a reasonable possibility that the result would have been different had the jury heard that she had lied, lied about the facts of the case. You have reserved a couple minutes' rebuttal. I beg your pardon? You have reserved rebuttal. Yes, I have. Two minutes. We'll hear you then. Thank you. Good morning, Your Honor. Shreve Ariel for the United States on behalf of the appellee. May it please the Court. I think I've just sort of addressed, one, the supplemental filing by the government in terms of the file that the government had in its possession at the time of the response. The adversary argues that those other PSRs were prepared after this trial. That's correct, Your Honor, certainly. And certainly we filed them simply to complete the record. At the time of the filing in the case, we didn't have the entirety of the record. And that was part of the issue in terms of our submission. We were actually waiting for boxes to arrive. We have them now, and we've been able to go through them. And so in the course of our conversations with defense counsel, we provided additional discovery, as was previously discussed. Did you have the Holder PSR before the trial? We had the Holder PSR in portions. Oh, sorry. Before the trial. Yeah, I'm sorry. I was talking about in connection with this appeal, Your Honor. I'm sorry. Yes, we did have the Holder PSR before the trial. And I just want to get to that, because the issue I think the gravamon of the giglio that defense counsel is raising is actually set forth in the complaint. And I say the gravamon of the giglio. I think it's perceived giglio. The complaint was filed against Holder on February 12, 2008. It was a publicly available document. And on March 7, 2008, a superseding indictment was filed charging Simpson and Holder and others in a broader conspiracy. At that point, that complaint is merged with the docket for Mr. Simpson, and it's publicly available for him. So that information, that complaint itself, is available to him for review 11 months prior to the trial. It would stretch the imagination to think that defense counsel for Mr. Simpson wouldn't have reviewed that complaint in advance of trial. It's an actual courier trip carried out that he's actually indicted for, which was the specific trip involving Ms. Yearwood in September 2007. So they had that before trial. They could have reviewed it. And it stands to reason that they did review it. And I say before the complaint that was filed against Holder. Yes. Only against Holder became a record in Simpson's case when the two cases were merged. That's correct, Your Honor. And, therefore, you're saying we should draw the inference that counsel for Simpson went back and reviewed the complaint that had been filed previously against Holder? I certainly think that would have been an appropriate step for an attorney to do, and any reasonable attorney who is defending their client for his involvement in a particular courier trip on a particular date could have gone back and looked at that and would have done that. You didn't separately provide it as $3,500 or anything? I did not, Your Honor. We did not, Your Honor. And that is assuming that it is inconsistent with her underlying. You were saying that a review of that complaint would have advised a lawyer who read it that Ms. Yearwood had told two different stories about how she was recruited, how she got to the other country, and who she met with and when she met Holder for the first time. I think, as Judge Johnson called it, I think it's a perceived inconsistency. It is not a perfectly articulated and artfully drafted complaint, but it is one that leaves open the possibility of multiple conspirators. And in this case, David Simpson and Sheldon Holder played similar roles. Someone who was defending Simpson at the start of the case and went back, as you said, and looked at the complaint against Holder and saw that a person identified only as what was a CW1 or something like that . . . That's correct, Your Honor. . . . had said that Holder had gotten her into this drug trafficking would have no reason to suspect at that time that what he saw gave notice of any inconsistent statements by anybody about anything. So in the context, Your Honor, just to be clear, Ms. Yearwood implicates both Mr. Simpson and Mr. Holder in the conspiracy prior to the date of the filing of that complaint. That complaint is then filed.  There's a footnote in the Klemt complaint, I can direct Your Honor's attention to it, in which it specifically says, as is common in complaints, that that . . . Page 2 of the complaint. The footnote. It says, So in the complaint, which is written for the purposes of charging Sheldon Holder, there is a reference specifically to Sheldon Holder's involvement in the conspiracy. It does not specifically mention David Simpson's involvement in the conspiracy. However, the proffer reports, which were disclosed to the defense counsel and reflect conversations that the cooperator, Michelle Yearwood, had prior to the filing of this complaint, do implicate David Simpson. He is part and parcel of the conspiracy and plays a similar role to Sheldon Holder in terms of the . . . from the perspective of Michelle Yearwood. David Simpson . . . I have no prior idea of 3500 material and Brady material that the government has got the obligation to produce it and to avoid having the defense counsel fishing around trying to put two and two together. And I'm not suggesting, Your Honor, anything else other than that. I'm saying it's . . . You are, because you're saying that he should have figured it all out, even though it was not produced. I think a very similar statement to the statement that's set forth in that complaint is actually contained in the 3500 material, 3500MY11. And specifically, in a proffer with the United States that was memorialized by the Homeland Security agents, in which Simpson and Holder are both implicated in the conspiracy, their respective roles are articulated, there is a line in which it says, Yearwood identified Sheldon Holder as the individual who facilitated and participated in drug smuggling operations, including the one she was involved with and arrested for on September 7, 2007. That's probably where something . . . this may have come from, I suspect. But the issue is whether defense counsel could have made something of the PSR. Whether it's reconcilable or irreconcilable, however you want to describe it, that seems to be the issue. I understood, Your Honor. And I would submit that this wouldn't take much for someone to sort of look at this and understand, okay, this is the statement about the trip that my client is involved in. I can look at this and investigate this further. But that's not our position with respect to the circuit. Here, obviously, Your Honor . . . Am I correct that Yearwood's testimony in Simpson's trial was to the effect that she didn't meet Holder until she got to New York? That is correct, Your Honor, that he was involved in that first trip, but only on the first round in New York. He subsequently, though, on the second trip, traveled to Trinidad, coordinated the trip from Trinidad. As to the first trip, her testimony in the Simpson trial is completely irreconcilable with the proposition that a man named Sheldon Holder met with CW1 and set up the first of the two drug trials. I think that's fair. That's accurate, Your Honor. And I do think that something is lost in translation, obviously, from the reports and to the actual statements. There's another inconsistency here. I mean, she testified at this trial that she was in Trinidad. She was just there for family reasons or for vacation, who knows what, and was recruited there. So you really have two different stories that this woman is telling. And with what defense counsel was given, I don't see how defense counsel could have skewered her with the fact that she has two completely different memories of the first trip. Well, I would say that Michelle Yearwood, Your Honor, was thoroughly impeached at trial, both with respect to her substantive narrative of the events, but also with respect to her prior criminal conduct. Couldn't have been thoroughly impeached, because otherwise he wouldn't have been impeached. I understand, Your Honor. But the problem, and this ultimately, I think, gets to the point that Your Honor brought up earlier, which was that everything she said was extraordinarily corroborated, and also there was independent evidence of Mr. Simpson's involvement in narcotics trafficking. So Ms. Yearwood proffered on December 6th to the government about Mr. Simpson's involvement in the conspiracy. Twelve days later — As to the corroboration you're talking about, if the jury came to the conclusion that Ms. Yearwood doesn't quite know what she's talking about, the jury might have credited or given more credit to what Mrs. Simpson said about these trips to the airport and these parking vouchers and all the rest of it. Is that correct? Well, Your Honor, respectfully, Mrs. Simpson's testimony was vague, extremely vague on that particular — those two particular points. She said generally that the woman — the girlfriend borrowed the car, and generally that the girlfriend borrowed the phone. The problem is, Mrs. Yearwood testified — sorry, Mrs. Yearwood proffers on December 6th. She says, David Simpson, Sheldon Holder involved in a conspiracy to bring narcotics into the country through couriers at the airport. David Simpson is on December 18th arrested facilitating the bringing in of narcotics into the United States through another courier, wholly unrelated to Ms. Yearwood. Ms. Santana. Ms. Santana. Now, the narcotics end up — they end up being sham narcotics, but that arrest, she could not have possibly known that David Simpson was going to be at the airport picking up another courier or that the government was going to be able to effect a controlled delivery and have him arrested. And then ultimately you have — you have David Simpson's car, the same car used in the two prior trips with Ms. Yearwood in the parking lot doing the exact same thing with Ms. Santana as he did with Michelle Yearwood. You also have him arrested with an iPhone, at the time a $400 iPhone, a brand new piece of technology, in his pocket. That iPhone has a telephone number. That was found in Michelle Yearwood's pocket at the time of her arrest in September of 2007. She couldn't — she couldn't have set that up. There's just no way that that could have come to pass. And then in his post-arrest statements — Would any dichotomy, assuming there is a dichotomy or inconsistency, have bearing on the — on the role, determination and sentencing? Not that I'm aware of, Your Honor. And just to follow on, because I do think it's important, so — How could that be? I mean, there's a statement that says that Mr. Holder was the mastermind or that suggests that. I think they — I think they played similar leadership roles. I don't think one was more significant than the other, and I think that can be characterized by both. Why couldn't it have an effect on the sentencing if the — if it would shake the jury's confidence with respect to the first trip, although not the second? Because the sentence was, I think, significantly affected by the quantity of drugs attributed to Simpson in the first trip. That's a fair point, Your Honor. Although, again, I stand to my point earlier, which was it's entirely corroborated. The car, the same car, which Ms. Yearwood describes to a T before he's arrested, is in the parking lot when Ms. Yearwood comes in. The phone contacts between Ms. Yearwood and Mr. Simpson that she couldn't have possibly have known about, other than if she actually had the conversations with Mr. Simpson, they are there. Those records exist. You see the records, the phone records, when Ms. Simpson — sorry, Ms. Yearwood gets arrested. The phone calls between David Simpson and Trinidad spike. He calls Trinidad 72 times on the day she's arrested, after she's picked up with 1.79 kilograms of coke. Then move back earlier to the earlier trip, the August 1st trip, same thing. We have David Simpson's car in the parking lot, the silver hatchback, caught on tape in the parking lot. We have phone calls between Michelle Yearwood and the iPhone. And we have records showing Ms. Yearwood coming into the United States on that date into the airport. And then prior to that, we have phone calls, just like Ms. Yearwood says, between her and David Simpson, consistent with everything she said. And so when you put all of that together and you put that in context with his arrest December 18th, that she could — she was under arrest at this time. She couldn't have possibly come up with or conceived of how that would possibly happen. He makes a statement to special agents at the time of his arrest. And he says — and this was the subject of the prior appeal, and I think defense counsel or appellate counsel at the prior appeal conceded this was a damning statement. He says, when he's asked by the agents whether he spoke to Ms. Santana when she came in, he said, she asked me when I was going to get paid, and I told her it would be a couple of days, which was a clear admission on the part of the defendant. He also stated to the agents after some time period during the interview that he wanted to cut a deal. Both of those statements I think were highly inculpatory, and when combined with all the other corroborating evidence, certainly extremely compelling evidence of guilt. Thank you, Your Honor. Mr. Ariel has spoken as if it's an established, undisputed fact that the iPhone calls were made by Mr. Simpson as opposed to somebody else using that phone, and that the car's presence was — reflected Mr. Simpson's presence as opposed to somebody else, Sophia McIntosh, who his — Mr. Simpson's wife testified was given the car and given the phone to use. So you can't — again, it goes back to the effect of the inability of defense counsel through lack of the inconsistent statement to show that Yearwood had been lying. Again, the wife might well have been accepted, or if not accepted beyond a reasonable doubt, accepted sufficiently to raise a reasonable doubt. Now, the defense counsel at trial raised an argument that Simpson had been set up, and that kind of argument often seems as kind of far-fetched, but the government has said, well, there's no way that Ms. Yearwood could have known in advance that David Caesar was whatever. Well, Ms. Yearwood was in touch with people who were — while she was out on bail, she — and she testified to it — she was in touch with Sheldon Holder's girlfriend. Sheldon Holder's girlfriend was Nadia Mitchell, as she talked about. She testified to this. This is in the trial. And she said that Sheldon Holder's girlfriend was urging her to cooperate. Well, Sheldon Holder hadn't been arrested yet. He hadn't been charged yet. Who is she urging him to cooperate against? Sheldon Holder. This was Holder's girlfriend. So Holder's and Holder's girlfriend and Michelle Yearwood's boyfriend, who was down in Trinidad, whose name was Nigel Belfont, who was in touch with her also and told her, oh, there was another mule on your plane that wasn't arrested. It got away. Another narcotics smuggler. These people would have been in a position to inform her about a setup that was going to come on, give her somebody to testify against in lieu of Sheldon Holder. They may not have known that she — at the time of this that she had already inculpated Sheldon Holder. Look, I'm not asking the Court to accept this. It's discussed in the brief, to accept that this — that this happened. We don't know. But it is not clear-cut, as the government seems to argue, that the fact that Michelle Yearwood came in before Simpson's arrest and talked about a David Caesar, that does not mean that necessarily that David Simpson was guilty. I mean, it just — there's so much in this, and it's quite a mess, quite a different kettle of fish that a jury would have been presented with had they heard that Michelle Yearwood had lied one way or the other. Thank you. Thank you both. We'll reserve decision.